FILED by _RGS_ D.C.

AUG 06 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

10-22863-CV-Seitz/O'Sullivan

MELISSA PHILIPIAN,
WHITE TIDES ENTERTAINMENT GROUP, INC.

            Plaintiffs,

v.

DWAYNE CARTER, AKA LiL' WAYNE,
CORTEZ BRYANT,
MICHAEL STEVENSON AKA TYGA,
JERMAINE PREYAN AKA MACK MAINE,
SYLVIA RHONE,
VICKI CHARLES,
KATINA BYNUM,
KIRA DANIELS,
ERIK PETTIE,
BRIAN WILLIAMS AKA BABY,
RONALD WILLIAMS AKA SLIM,
HORACE MADISON,
ERSKINE ISAAC,
DAVID NELSON,
MUSTAFA HOOTEN,
SHARLENE CLARK,
JOSEPH PORTER,
RON SWEENEY,
YOUNG MONEY ENTERTAINMENT,
YOUNG MONEY TOURING,
BRYANT MANAGEMENT,
TYGA MUSIC, LLC,
UNIVERSAL MUSIC GROUP,
UNIVERSAL RECORDS,
CASH MONEY RECORDS,
MADISON SMALLWOOD FINANCIAL GROUP,
UJAAMA TALENT AGENCY,
JOHN DOE(S),

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

JANE DOE(S),                                          :
UNKNOWN PERSON(S),                                    :
                                                     :
                          Defendants.                :
_____          :

## COMPLAINT AND JURY DEMAND

Plaintiffs Melissa Philipian and White Tides Entertainment Group,

complaining of the Defendants say(s) that:

## I. JURISDICTION:

1. This court having jurisdiction of this civil action under:

(a) 28 U.S.C. § 1331 and 28 U.S.C. § 2201, as this is an action

brought, inter alia to redress the deprivations of rights, privileges and immunities

secured to the plaintiff  by 28 U.S.C. § 2201 so as to obtain relief from a Federal

Court Judgment by declaring that judgment void; and

(b) 28 USC § 1367(a) as some of the claims set forth herein are claims

under the statutory and common laws of the State of Florida but are so related to

claims in the action for Declaratory Relief under 28 U.S.C. § 2201 that they form

part of the same case or controversy under Article III of the U.S. Constitution; and

(c) Any other Federal common or statutory law that governs the

allegations complained of below.

## II.  VENUE

2.  This court is the proper venue of this civil action under:

(a) 28 U.S.C. § 1391(b)(2), as this action is founded on federal Question pursuant to 28 U.S.C. § 2201 and on supplemental jurisdiction and the matter in controversy is the deprivation of rights, privileges and immunities secured to the plaintiff by the laws of the United States of America and State of Florida, occurring substantially in the Southern District of Florida (28 U.S.C. § 89(c)).

## III. PARTIES:

3. Plaintiff, **Melissa Philipian** is, at the time of the filing of this Complaint, a United States citizen and a resident of the State of Florida, County of Miami-Dade, with an address of 834 Ocean Drive, Miami Beach, Florida 33139, and at all times relevant to this action was and is an artist and talent manager in the Entertainment Industry.

4. Plaintiff, **White Tides Entertainment Group, Inc.,** is at the time of the filing of this complaint, a private entity, duly organized as an artist and talent management company, possessing the corporate power to sue and be sued, at all times relevant to this action was and is organized for the purpose of providing artist and talent management services to individuals and entities in the

Entertainment Industry, with a business address of 834 Ocean Drive, Miami
Beach, Florida 33139.

5. Defendant, **Dwayne Carter, aka Lil' Wayne** is, at the time of the filing
of this Complaint, a United States citizen and, upon belief, is a resident of the State
of New York, County of Queens and, upon information and belief, currently
resides at the address of 10-10 Hazen Street, East Elmhurst, New York 11370, and
at all times relevant to this action was and is a recording artist with a successful
career in the Entertainment Industry. He is also the owner and/or officer of the
Defendants, Young Money Entertainment and Young Money Touring companies.
He is being sued in his individual and official capacities.

6. Defendant, **Cortez Bryant** is, at the time of the filing of this Complaint, a
United States citizen and a resident of the State of Florida, County of Dade, and,
upon information and belief, has a business address of 1111 Lincoln Road, 4th
Floor, Miami Beach, Florida 33139,  and at all times relevant to this action was
and is a friend of Defendant, Dwayne Carter and served as road manager of
Defendant Carter under the supervision of Plaintiff, Philipian and is now manager
of Defendant Carter. He is being sued in his individual and official capacities.

7. Defendant, **Michael Stevenson aka Tyga** is, at the time of the filing of
this Complaint, a United States citizen and a resident of the State of California,
County of Los Angeles, and, upon information and belief, resides at address of

1050 South Flower Street, Los Angeles, California 90015, and at all times relevant to this action was and is a recording artist in the Entertainment Industry and owner of Tyga Music, LLC.  He is being sued in both his individual and official capacities.

8. Defendant, **Jermaine Preyan aka Mack Maine** is, at the time of the filing of this Complaint, a United States citizen, and at all times relevant to this action was and is a recording artist on the Young Money Entertainment record label and President of Young Money Entertainment.  He is being sued in both his individual and official capacities.

9. Defendant, **Sylvia Rhone** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 1755 Broadway, New York, New York 10019, and at all times relevant to this action was and is the President of Universal Music Group's record label, Universal Motown Records.  She is being sued in her official capacity.

10. Defendant, **Vicki Charles** is, at the time of the filing of this Complaint, United States citizen and, upon information and belief, has a business address of 1755 Broadway, New York, New York 10019, and at all times relevant to this action was an employee of Defendant, Universal Music Group's Universal Motown Records.  She is being sued in her official capacity.

11. Defendant, **Katina Bynum** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 1755 Broadway, New York, New York 10019, and at all times relevant to this action was an employee of Defendant, Universal Music Group's Universal Motown Records.  She is being sued in her official capacity.

12. Defendant, **Kira Daniels** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 1755 Broadway, New York, New York 10019, and at all times relevant to this action was an employee of Defendant, Universal Music Group's Universal Motown Records.  She is being sued in her official capacity.

13. Defendant, **Erik Pettie** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 1755 Broadway, New York, New York 10019, and at all times relevant to this action was an employee of Defendant, Universal Music Group's Universal Motown Records.  She is being sued in her official capacity.

14. Defendant, **Bryan Williams aka "Baby"** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 1755 Broadway, New York, New York 10019, and at all times relevant to this action was an employee and/or officer and/or co-owner of Defendant, Cash Money Records.  He is being sued in his official capacity.

15. Defendant **Ronald Williams aka "Slim"** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 1755 Broadway, New York, New York 10019, and at all times relevant to this action was an employee and/or officer and/or co-owner of Defendant, Cash Money Records. He is being sued in his official capacity.

16. Defendant, **Horace Madison** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 1111 Lincoln Road, Suite #400, Miami, Florida 33139, and at all times relevant to this action was an employee and partner of Madison Smallwood Financial. He is being sued in his official capacity.

17. Defendant, **Mustafa Hooten**, is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 330 Madison Avenue, #9, New York, New York 10017 and at all times relevant to this action was an employee of Madison Smallwood Financial. She is being sued in her official capacity.

18. Defendant, **Sharlene Clark** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 1111 Lincoln Road, Suite #400, Miami, Florida 33139, and at all times relevant to this action was an employee of Madison Smallwood Financial. She is being sued in her official capacity.

19. Defendant, **Erskine Isaac** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 888 7th Avenue, New York, New York 10106, and at all times relevant to this action was an employee of and partner Ujaama Talent Agency.  He is being sued in his official capacity.

20. Defendant, **David Nelson** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 888 7th Avenue, New York, New York 10106, and at all times relevant to this action was an employee and partner of Ujaama Talent Agency.  He is being sued in his official capacity.

21. Defendant, **Sheron Rivers** is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 888 7th Avenue, New York, New York 10106, and at all times relevant to this action was an employee of Ujaama Talent Agency.  She is being sued in his official capacity.

22. Defendant, **Joseph Porter, Esq.**, is, at the time of the filing of this Complaint, a United States citizen and, upon information and belief, has a business address of 206 3rd Street, Seal Beach, California 90740, and at all times relevant to this action was the legal representative of Defendant Carter in the Breach of Contract suit filed by Plaintiff, Philipian.  He is being sued in his official capacity.

8

23. Defendant, **Ron Sweeney, Esq.,** is, at the time of the filing of this Complaint, a United States citizen and a resident of the State of New York, County of New York and, upon information and belief, has a business address of 222 Riverside Drive, Penthouse 5A, New York, New York 10025, and at all times relevant to this action was and is both a friend and legal representative of Defendant Carter.  He is being sued in his individual and official capacities.

24. Defendant, **Young Money Entertainment** is, at the time of this complaint, a private entity, duly organized as a music company, possessing the corporate power to sue and be sued, at all times relevant to this action was and is a company owned by Defendant Carter. Young Money Entertainment is being sued under a theory of master/servant and/or respondent superior liability.  Its principle place of business is presently 1111 Lincoln Road, 4th Floor, Miami Beach, Florida 33139.

25. Defendant, **Young Money Touring** is, at the time of this complaint, a private entity, duly organized as an artist touring and concert company, possessing the corporate power to sue and be sued, at all times relevant to this action was and is a company owned by Defendant, Carter.  Young Money Touring is being sued under a theory of master/servant and/or respondent superior liability. Its principle place of business is presently 1111 Lincoln Road, 4th Floor, Miami Beach, Florida 33139.

26. Defendant, **Bryant Management**, is at the time of the filing of this complaint, a private entity, duly organized as an artist and talent management company, possessing the corporate power to sue and be sued, at all times relevant to this action was and is a company owned by Defendant, Cortez Bryant and organized for the purpose providing artist and talent management services to individuals and entities in the Entertainment Industry.  Bryant Management is being sued under a theory of master/servant and/or respondent superior liability. Its principle place of business is presently 1111 Lincoln Road, 4th Floor, Miami Beach, Florida 33139.

27. Defendant, **Tyga Music, LLC** is at the time of the filing of this complaint, a private entity, duly organized as music company, possessing the corporate power to sue and be sued, at all times relevant to this action was and is owned by Defendant Michael Stevenson. Tyga Music, LLC is being sued under a theory of master/servant and/or respondent superior liability. Its principle place of business is presently believed to be 1050 South Flower Street, Los Angeles, California 90015.

28. Defendant, **Universal Music Group** is, at the time of this complaint, a private entity, duly organized as a music company, possessing the corporate power to sue and be sued, at all times relevant to this action was and is comprised of two core businesses, recorded music and music publishing. Universal Music Group is

being sued under a theory of master/servant and/or respondent superior liability. Its

principle place of business is presently 1755 Broadway, New York, New York

10019.

29. Defendant, **Universal Motown Records** is, at the time of this complaint,

a private entity, duly organized as a music recording company, possessing the

corporate power to sue and be sued, at all times relevant to this action was and is

owned by Defendant Universal Music Group. Universal Motown Records is being

sued under a theory of master/servant and/or respondent superior liability. Its

principle place of business is presently 1755 Broadway, New York, New York

10019.

30. Defendant, **Cash Money Records** is at the time of this complaint, a

private entity, duly organized as a music company, possessing the corporate power

to sue and be sued, at all times relevant to this action was and is owned by

Defendant, Bryan Williams. Cash Money Records is being sued under a theory of

master/servant and/or respondent superior liability. Upon information and belief its

business address is 1755 Broadway, New York, New York 10019.

31. Defendant, **Madison Smallwood Financial Group** is at the time of this

complaint, a private entity, duly organized as an accounting and business

management firm, possessing the corporate power to sue and be sued, at all times

relevant to this action was and is organized for the purpose providing accounting

and business management services to individuals and entities.  Madison

Smallwood Financial is being sued under a theory of master/servant and/or

respondent superior liability. Its principle place of business is presently 1111

Lincoln Road, Suite 400, Miami, Florid 33139.

32. Defendant, **Ujaama Talent Agency** is, at the time of this complaint, a

private entity, duly organized as a talent agency, possessing the corporate power to

sue and be sued, at all times relevant to this action was and is organized for the

purpose providing artist and talent services related to the booking of public

appearance and performances.  Ujaama Talent Agency is being sued under a theory

of master/servant and/or respondent superior liability. Its principle place of

business is presently 888 7th Avenue, New York, New York 10106.

33. Defendant, **Unknown Insurance Company(ies)** is, at the time of this

complaint, a private or public entity, duly organized as an insurance company,

possessing the corporate power to sue and be sued, at all times relevant to this

action was and is organized for the purpose providing the Defendants' liability

insurance and/or indemnification for damages accessed and adjudged against

Defendants for injuries inflicted upon Plaintiff as a result of the acts and/or

omissions of Defendants.

34. Defendant, **John Doe(s)** is, upon information and belief, a United States

citizen, name unknown, and at all times relevant to this action acted directly or in

concert with one or more Defendants with reference to the allegations enumerated herein.

35. Defendant, **Jane Doe(s)** is, upon information and belief, a United States citizen, name unknown, and at all times relevant to this action acted directly or in concert with one or more Defendants with reference to the allegations enumerated herein.

36. Defendant, **Unknown Person(s)** is, upon information and belief, a United States citizen, currently unknown to Plaintiff, and at all times relevant to this action acted directly or in concert with one or more Defendants with reference to the allegations enumerated herein.

## IV. FACTS:

37. Between the years March 1999 and October 2003, Plaintiff, Melissa Philipian (hereinafter referred to as "Philipian"), built a career in the artist management field of the Entertainment Industry with such high profile celebrity recording artists as Eve and Chink Santana.

38. On or about October 2003, Plaintiffs and Defendant, Wayne Carter, aka Lil Wayne (hereinafter referred to as "Carter") entered a verbal agreement that Philipian and her management company Plaintiff, White Tides Entertainment Group, Inc. (hereinafter "WT") would represent Carter as his exclusive manager with regard to all aspects of his musical career throughout the world. Philipian

immediately began to perform her obligations and duties as Carter's manager and in that capacity secured paid shows for Carter with increased fees, secured features on high profile artist recordings, renegotiated Carter's recording contract with Defendant, Universal Motown Records for Albums, Carter 1 through Carter 5, created Carter's Young Money record label and established Carter as one of the most successful and sought after artists of his time.

39. Philipian and Carter, however, did not reduce their management agreement to writing until June 20, 2005. On that date, Philipian and Carter signed an artist management agreement. See Exclusive Management Agreement attached hereto, incorporated herein and made a part hereof as **Exhibit A**.

40. At the time the artist management agreement was signed and consummated between Philipian and Carter, Philipian was located in Miami, Florida and Carter was located in New York City. Philipian and Carter, therefore, did sign their prospective copies of the agreement and also agreed to fax each other their signed signature page of the agreement with Carter promising to deliver the hard copy of the signature page containing his original signature to Philipian for her records. This was especially important to Philipian since she did not witness him sign the agreement.

41. Philipian, upon request and requirement by representatives of Madison Smallwood Financial Group (Carter's business manager and accountant)

14

(hereinafter referred to as "MSFG"), including those representatives of MSFG listed as Defendants, provided MSFG with a copy of the artist management agreement between Philipian and Carter. This was done in order for Philipian to verify her position and authority as Carter's manager and to secure her interest in Carter's gross income as his artist manager consistent with the terms of the artist management agreement.

42. Philipian also informed all Defendants in this action of the consummation of the written artist management agreement with Carter and reiterated to them her position and authority as Carter's manager. Immediately thereafter, MSFG and all the Defendants conducted themselves consistent with the terms of the management agreement and interacted with Philipian in her capacity as Carter's manager and in a way consistent with the benefits and obligations of both Philipian and Carter as enumerated in the artist management agreement's terms.

43. Nevertheless, Carter failed and refused delivered the original signature page with his signature on it to Philipian as promised and on December 5, 2005, the day before Carter was to receive income in the amount of approximately one million dollars of which Philipian was owed more than half, Carter fired Philipian as his manager without cause and in violation of the terms of their artist management agreement.

44. Thereafter, Carter immediately instructed all parties involved in his musical career and/or involved in the income derived therefrom , including but not limited to Defendant, Bryant Cortez, Defendant, Cash Money Records and its Defendant employees, associates and representatives, Defendant, Universal Music Group, Universal Motown Records and their Defendant employees, associates and representatives, Defendants Young Money Entertainment, Young Money Touring and their employees, associates and representatives, Defendant Ujaama Talent Agency and its employees, associates and representatives and MSFG and its employees, associates and representatives as well as all other Defendants listed in this action to discontinue doing business with Philipian and WT in the capacity as Carter's manager and to deny any knowledge that Philipian or WT ever served in that capacity.

45. As a result, all contact by Philipian to the individuals and entities involved in Carter's musical career, including but not limited to the Defendants listed in this action were met with denials that they had any knowledge of Philipian's position as Carter's manager or the artist management agreement between her and Carter.

46. Therefore, on April 6, 2006, Philipian filed suit against Carter for breach of contract.  The Complaint was filed in the United States District Court for the

Southern District of Florida and entitled <u>White Tides Entertainment Group, Inc. v.</u>
<u>Dwayne Carter, aka Lil Wayne, et al.</u> (Case No. 06-20873).

47. In answering Philipian's complaint, Carter denied entering into an artist management agreement with Philipian or WT in any manner and denied that Philipian was ever his manager at any time.

48. Carter's answers to interrogatories contained the same denials, that Philipian and WT was never his manager at any time and that he never signed any management agreement with Philipian.

49. All discovery requests during the breach of contract litigation for documents and anything in possession of Carter or within his knowledge containing proof of Philipian and WT's position as his manager was denied by Carter as not ever existing.

50. During Carter's sworn deposition, when confronted with proof of Philipian's position as his manager through the artist management agreement containing his signature on the faxed signature page, Carter not only continued to deny that he signed the agreement but accused Philipian of forging his signature.

51. All of these denials were made by Carter directly or through his counsel, Defendant Joseph Porter, Esq. (hereinafter referred to as "Porter") even though Porter had knowledge of Philipian's position as Carter's manager.

52. Philipian now not only had to contend with the denials of her and WT's position and status as Carter's manager from those parties and Defendants who she worked with on a daily basis as Carter's manager, she had to contend with Carter denying that he ever signed the artist management agreement and accusing her of forgery. Therefore, because Carter: (1) never delivered the signature page with his original signature; (2) suborned the denial of her and WT's position as his manager; (3) denied that Philipian or WT was ever his manager; (4) denied the existence of any evidence showing Philipian and WT was his manager and (5) accused Philipian of forgery, Philipian was forced to give up her claims and enter a settlement and stipulation of dismissal with Carter on August 9, 2006. See Settlement and Release Agreement attached hereto, incorporated herein and made a part hereof as **Exhibit B**.

53. Although Philipian was owed millions of dollars at the time of settlement, she settled for approximately three-hundred seventy-five thousand dollars ($375,000.00).

54. Thereafter, Carter began a campaign to defame Philipian in the Entertainment Industry, in violation of the terms of the settlement agreement, by spreading lies that Philipian stole money from him and instituted her lawsuit as a scam to extort Carter, destroying Philipian's reputation and crippled her ability to

secure quality artists with star potential in the capacity as an artist manager. This defamation campaign continues to this day.

55. On or about July 2009, Philipian entered into a verbal agreement with Michael Stevenson aka Tyga (hereinafter referred to as "Stevenson") to be Stevenson's manager of his musical career throughout the world.

56. Consistent with their agreement, Philipian advanced approximately seven thousand dollars ($7,000.00) to Stevenson as financial support in his professional capacity as a recording artist and as financial support while he was performing on Carter's "America's Most Wanted Tour in the interim of and while the artist management contract was being prepared.

57. Shortly thereafter, when Carter was informed of Philipian's and Stevenson's, agreement, he and Jermaine Preyan aka Mack Maine (hereinafter referred to as "Preyan") informed Stevenson that he (Carter) would not do business with anyone who does business with Philipian and that Philipian was a thief and had extorted him through her breach of contract suit.

58. As a result, Stevenson discontinued his business relationship with Philipian and refused to have Philipian continue to manage him and refused to repay Philipian the seven thousand dollar ($7,000.00) advance.

59. On or about November of 2009, Philipian was contacted by a friend who informed her that there was an interview of Carter (hereinafter referred to as the

"Carter Interview") posted on the website Youtube wherein Carter had been discussing his professional relationship with Philipian.

60. Thereafter, Philipian found the Carter Interview on the Youtube site and discovered that the interview had been posted on Youtube only a couple of months prior to Philipian discovering it but appeared to have been conducted during the time period Philipian had managed Carter.

61. Philipian was not present during the Carter Interview and had no knowledge that the interview ever took place or existed until the date she was informed of its existence on Youtube.

62. In the Carter Interview, Carter not only acknowledges that Philipian was his manager but that Philipian was the best thing that had happened to his career and that he would not have achieved the success he did without her. Carter then proceeded to run down a laundry list of accomplishments Philipian achieved on his behalf in the capacity as his manager.

63. Philipian also discovered that Carter conducted the Carter Interview and kept a copy of it as a part of his career portfolio. He, therefore, lied and committed fraud when he intentionally denied having any evidence of Philipian's relationship with him as his manager as well as when he denied that Philipian had ever been his manager.

64. Had Philipian been provided the Carter Interview evidence as required by the rules of discovery and had Philipian not been fraudulently neutralized in her proofs, mislead and lied to by Carter, Philipian would never have abandoned her breach of contract claims in favor of a settlement and stipulation of dismissal.

65. Because Carter was and is the top hip hop artist in the world, earning well over $200,000 million dollars to date, his act of fraudulently inducing Philipian into abandoning her claims, his defamation of Philipian and his torturous interference with her contract with Stevenson has destroyed Philipian's career and has caused her to lose tens of millions of dollars in past, present and future earnings.

## V.  CLAIMS FOR RELIEF

### COUNT I

### (Fraud in the Inducement – Dwayne Carter, Joseph Porter, Esq.)

The Plaintiffs, Philipian and WT, herein reaffirm and re-allege each and every allegation, from paragraph 1 through paragraph 65, set forth in this Complaint and allege further that:

66.  Plaintiffs have been subjected, by the above recited acts, to the deprivation by Carter and Porter, separately and in concert, to fraudulent acts that caused Plaintiffs' injuries by inducing Philipian into settling her Breach of

Contract suit and entering into a stipulation of dismissal in that case which caused

Plaintiffs the lost of millions of dollars in past, present and future income.

67. Specifically, Carter made false statements, in his answer to Plaintiffs'

Breach of Contract suit, responses to discovery requests and, under oath, in his

answers to Plaintiffs' interrogatories and during his deposition that: (1) Philipian

and WT had never been his manager; (2) he had never signed a management

agreement with Philipian or WT; (3) he had no knowledge of any evidence and no

evidence showing that Philipian or WT was his manager; and (4) that Philipian had

forged his signature on the artist management agreement she possessed.

68. In light of the discovery of the Carter Interview, however, both Carter

and Porter, (Carter's attorney representing him in the Breach of Contract suit)

knew or should have known the statements Carter made were false. Yet Porter

submitted Carter's false statements as answers to Plaintiffs' complaint and

interrogatories as well as in response to other requests for discoverable materials

by Plaintiffs. Porter allowed Carter to testify falsely at Carter's deposition then

used all of those false statements in court documents in support of the settlement

and stipulation of dismissal.

69. Carter also knew that Philipian did not witness him sign the management

agreement and knew that Philipian could not prove that he signed the management

agreement because she was not privy to any witnesses to that effect. Therefore,

without any witness to Carter's signing of the management agreement, and the threat of Carter's allegation that Philipian forged his signature, which constitutes a crime punishable by imprisonment, Carter's false statements decimated the strength of Philipian's breach of contract case and so adversely affected her proofs that success on her claims was almost impossible.  As a result, Philipian opted to settle and dismiss her claims, which was the intent of Carter and Porter and the obvious and foreseeable result of their actions.  However, had Carter and Porter told the truth about the existence of the Carter Interview and disclosed it as required in Plaintiffs' discovery request, Plaintiff would have had powerful evidence supporting her breach of contract claim and would not have abandoned it even in light of the other false statements made by Carter and Porter.

70. The settlement and stipulation of dismissal cost Philipian millions of dollars in lost past, present and future wages and the loss of one of the most successful hip hop artist in music history along with the prestige, reputation, clout, power and influence that comes with the management of such a successful artist.

WHEREFORE, Plaintiff, Philipian and WT, pursuant to the applicable laws, prays for a judgment of liability against Carter and Porter, individually, jointly and severally and demands compensatory damages and punitive damages in a substantial sum, interest thereon, attorneys fees and costs of this action against

Carter and such other and further relief as this Honorable Court deems necessary and appropriate.

## COUNT II

### (Defamation (Slander and Slander Per Se) –
### Dwayne Carter, Jermaine Preyan)

The Plaintiffs, Philipian and WT, herein reaffirm and re-allege each and every allegation, from paragraph 1 through paragraph 70, set forth in this Complaint and allege further that:

71.  Plaintiffs have been subjected, by the above recited acts of Carter and Jermaine Preyan, to the deprivation of personal and business success, reputation, integrity and acumen, separately and in concert, based on defamatory acts that caused Plaintiffs' injuries such as making false statements about Philipian of a derogatory, demeaning and corrupting nature in her individual capacity and in her capacity as an artist manager and business person in the Entertainment Industry.

72. Specifically, Carter and Preyan have made and continue to make false statements that Philipian is a thief and that Philipian stole money from Carter and that Philipian instituted her breach of contract suit against Carter in order to extort money from Carter.

73. Both Carter and Preyan have spread and continue to spread these false statements throughout the Entertainment Industry.  In addition to the demamtory

statements, Carter further warns anyone he finds that is doing business with or about to do business with Philipian that he would not do business with anyone that is doing business with Philipian.

74. In fact when Carter was informed that Philipian was to manage Stevenson, Carter and Preyan iterated the false statements to Stevenson enumerated paragraph 72 and warned Stevenson that he (Carter) would not do business with anyone who does business with Philipian. Stevenson, at the time was performing for Carter on Carter's America's Most Wanted Tour and was looking to get signed to Carter's label Young Money.

75. As a result, Stevenson informed Philipian that he could not allow her to manage him because Carter instructed him not to and because of Carter's defamation of Philipian, he was unsure if he could trust her and refused to repay Philipian the seven thousand dollars ($7,000.00) Philipian had advanced him in the interim of a contract being drawn up enumerating her duties and obligations as Stevenson's manager.

76. Carter's and Preyan's campaign to defame Philipian were negligently and maliciously designed to incite hatred, ridicule and distrust for Philipian both personally and professionally and to ruin Philipian as a sought after, prominent, prosperous and successful artist and talent manager in the Entertainment Industry. As Carter is the one of the most influential and successful recording artist of his

time, his defamatory remarks and those of his artist and President of his record label, Preyan, has all but destroyed Philipian's personal and professional reputation.

77. Carter's and Preyan's defamation has cost Philipian the lost opportunity of doing business with countless recording artists and other talent in the Entertainment Industry of all levels of success as well as the loss millions of dollars in past, present and future income.

WHEREFORE, Plaintiff, Philipian and WT, pursuant to the applicable laws, prays for a judgment of liability against Carter and Preyan, individually, jointly and severally and demands compensatory damages and punitive damages in a substantial sum, interest thereon, attorneys fees and costs of this action against Carter and such other and further relief as this Honorable Court deems necessary and appropriate.

## COUNT III

### (Tortious Interference with Advantageous Business Relationship and Contract – Dwayne Carter, Jermaine Preyan)

The Plaintiffs, Philipian and WT, herein reaffirm and re-allege each and every allegation, from paragraph 1 through paragraph 77, set forth in this Complaint and allege further that:

78.  Plaintiffs have been subjected, by the above recited acts of Carter and Jermaine Preyan, to the deprivation of their business relationship with Stevenson and others as an artist manager.

79. Specifically, Philipian entered into a verbal agreement with Michael Stevenson to be Stevenson's manager of his musical career throughout the world. The agreement called for Philipian to begin her representation of Stevenson as his manager immediately while the written agreement was being prepared for signature.

80. Consistent with and in consideration of their agreement, Philipian advanced approximately seven thousand ($7,000.00) recoupable dollars to Stevenson as financial support in his professional capacity as a recording artist and as financial support while he was performing on Carter's American Most Wanted Tour in the interim of and while the artist management contract was being prepared.

81. When Carter was informed of Philipian's and Stevenson's, agreement, he and Preyan falsely stated to Stevenson that he (Carter) would not do business with anyone who does business with Philipian and that Philipian was a thief and had extorted him through her breach of contract suit.

82. As a result of Carter's and Preyan's actions, Stevenson refused to have Philipian manage him any longer and refused to repay Philipian the seven thousand

dollar ($7,000.00) she advanced him.  Philipian not only lost Stevenson as an artist but also the opportunity to manage other artists in the same camp including Aubrey Drake Graham and Onika Maraj aka Nikki Menaj, the hottest female hip hop artist today and currently the most successful.

WHEREFORE, Plaintiff, Philipian and WT, pursuant to the applicable laws, prays for a judgment of liability against Carter and Preyan, individually, jointly and severally and demands compensatory damages and punitive damages in a substantial sum, interest thereon, attorneys fees and costs of this action and such other and further relief as this Honorable Court deems necessary and appropriate.

## COUNT IV

## (Breach of Contract – Dwayne Carter)

The Plaintiffs, Philipian and WT, herein reaffirm and re-allege each and every allegation, from paragraph 1 through paragraph 82, set forth in this Complaint and allege further that:

83.  Plaintiffs have been subjected, by the above recited acts, to the deprivation by Carter, of the rights, privileges and immunities, given under the "Settlement and Release Agreement" in the breach of contract case, not to be disparaged and to obtain RIAA Certification for Gold and Platinum Records.

84. Specifically, the August 9, 2006 release states and Carter agreed in pertinent part:

**Non-Disparagement**. The parties agree that they shall not slander, defame or disparage one another. If asked to comment on the other party, the parties shall state in substance "all issues pertaining to my business relationship with (the other) have been amicably resolved." [Settlement Agreement at 8, ¶ 19].

**Platinum Records**. Carter shall provide WT written permission to obtain RIAA Certification/Gold/Platinum Records on any albums released under the Record Contract.

Settlement Agreement at 8, ¶ 20. As enumerated in the Facts as well as Counts II and III, Infra, and reaffirmed and realleged herein, Carter has defamed Philipian and caused her serious injury. Carter has also refused every request by Philipian to obtain RIAA Certification for his Gold and Platinum Recordings.

85. As a result of the breach and continued breach of the Settlement and Release Agreement, Philipian and WT has lost millions of dollars in past, present and future income as well as RIAA Certified Gold and Platinum recordings.

WHEREFORE, Plaintiff, Philipian and WT, pursuant to the applicable laws, prays for a judgment of liability against Carter and demands compensatory damages and punitive damages in a substantial sum, interest thereon, attorneys fees and costs of this action and such other and further relief as this Honorable Court deems necessary and appropriate.

## COUNT V

**(Civil Conspiracy – Dwayne Carter, Cortez Bryant, Michael Stevenson Jermaine Preyan, Sylvia Rhone, Vicki Charles, Katina Bynum, Kira Daniels, Erik Pettie, Brian Williams, Ronald Williams, Horace Madison, Erskine Isaac, David Nelson, Mustafa Hooten, Sharlene Clark, Joseph Porter, Esq. Ron Sweeney, Esq., John Doe(s), Jane Doe(s), Unknown Person(s))**

The Plaintiffs, Philipian and WT, herein reaffirm and re-allege each and every allegation, from paragraph 1 through paragraph 85, set forth in this Complaint and allege further that:

86.  In doing the acts and things above complained of, defendants were conspirators engaged in a continuing scheme and continuing conspiracy—on, about and between December 5, 2005 to the present—designed and intended to deny and deprive plaintiff of rights, privileges and immunities guaranteed to her under the common and statutory laws of the United States of America, the State of Florida and the Settlement and Release Agreement wherein two or more of the defendants agreed that such denial and deprivation would take place .

87. Specifically, Defendants, Dwayne Carter, Cortez Bryant, Michael Stevenson, Jermaine Preyan, Sylvia Rhone, Vicki Charles, Katina Bynum, Kira Daniels, Erik Pettie, Brian Williams, Ronald Williams, Horace Madison, Erskine Isaac, David Nelson, Mustafa Hooten, Sharlene Clark, Joseph Porter, Esq. Ron Sweeney, Esq., John Doe(s), Jane Doe(s), Unknown Person(s) joined into the

conspiracy at the request of Dwayne Carter and/or at the request of each other or on their own accord.

88. As a direct consequence and result of the conspiratorial acts of defendants, with at least one of the defendants taking substantial steps in furtherance of carrying out the objects of the conspiracy such as defrauding Plaintiffs, Philipian and WT out of their management relationship with Carter, fraudulently inducing Plaintiffs into settling and releasing their breach of contract claims and rights, torturously interfering with Plaintiffs' business relationships and contracts, breaching the settlement and release agreement and defaming and destroying Philipian's reputation and her career, Plaintiffs have and still suffer the loss of reputation, influence, power, career, success and loss of past, present and future income amounting in the millions of dollars.

WHEREFORE, Plaintiffs, Philipian and WT, pursuant to the applicable laws, prays for a judgment of liability and demands compensatory damages and punitive damages in a substantial sum, interest thereon, attorneys fees and costs of this action against all defendants, and each of them, individually, collectively and severally and such other and further relief as this Honorable Court deems necessary and appropriate.

## COUNT VI

### (<u>Unjust Enrichment</u> – Michael Stevenson)

The Plaintiffs, Philipian and WT, herein reaffirms and re-allege each and every allegation, from paragraph 1 through paragraph 88, set forth in this Complaint and alleges further that:

89.  Plaintiffs have been subjected, by the above recited acts, to the deprivation by Stevenson of the benefit of managing Stevenson's music career while Stevenson has been unjustly enriched by the benefit conferred upon him by Philipian.

90. Specifically, Philipian and Stevenson agreed that Philipian would manage Stevenson's music career throughout the world.

91. Consistent with and in consideration of their agreement, Philipian advanced approximately seven thousand dollars ($7,000.00) to Stevenson as financial support in his professional capacity as a recording artist and as financial support while he was on Carter's American Most Wanted Tour, in the interim of and while the artist management contract was being prepared.

92. Stevenson, however, took the $7,000.00, used it in support of his career pursuits then dropped Philipian as his manager and never repaid her the $7,000.00, resulting in an inequitable retention of Philipian's money.

WHEREFORE, Plaintiff, Philipian and WT, pursuant to the applicable laws, prays for a judgment of liability against Stevenson and demands compensatory damages and punitive damages in a substantial sum, interest thereon, attorneys fees and costs of this action and such other and further relief as this Honorable Court deems necessary and appropriate.

## COUNT VII

### (Declaratory Judgment Voiding Settlement and Release Agreement and Stipulation of Dismissal in Breach of Contract Action– Dwayne Carter)

The Plaintiffs, Philipian and WT, herein reaffirms and re-allege each and every allegation, from paragraph 1 through paragraph 92, set forth in this Complaint and alleges further that:

93.  Plaintiff, Philipian was fraudulently induced into Settling and releasing her breach of contract claims as well as stipulating the dismissal of those claims by the above recited acts of defendants, and each of them separately and in concert.

94. As a result of the fraudulent inducement, the Settlement and Release Agreement as well as the Stipulation of dismissal is voidable.

WHEREFORE, Plaintiff, Philipian and WT, pursuant to the applicable laws, prays for a judgment pursuant to 28 U.S.C. § 2201, et seq., Declaring the Settlement and Release Agreement as well as the Stipulation of Dismissal in

Plaintiff's breach of contract case entitled. <u>White Tides Entertainment, Inc., et al.</u>

<u>v. Dwayne Carter, et al.</u>, case no. No. 06-20873, void and of no force and effect.

## VI. JURY DEMAND

Plaintiffs, Melissa Philipian and White Tides Entertainment, Inc., hereby

demands trial by jury of 12 persons on all issues.

Respectfully submitted,

Melissa Philipian/Plaintiff
P.O. Box 173455
Hialeah, FL  33015
(310) 259-4009

## VERIFICATION

I. Melissa Philipian, as President of White Tides Entertainment Group, Inc .
declare under penalty of perjury that I have read the foregoing Verified Complaint
and that the allegations contained herein are true and correct .

Melissa Philipian/Plaintiff
P.O. Box 173455
Hialeah, FL  33015
(310) 259-4009

34

<u>EXCLUSIVE MANAGEMENT AGREEMENT</u>

AGREEMENT MADE this 10th day of June, 2005, by and between White Tides Entertainment Group Inc., 111 Lincoln Road, Suite 400, Miami Beach, Florida 33139 ("Company") and Dwayne Carter, c/o Ron Sweeney, 440 9th Avenue, NY, NY 10001 ("You" or "you").

In consideration of the mutual covenants and promises hereinafter contained, the parties agree as follows:

1) The term of this Agreement (the "Term") shall be for a period of three (3) years commencing on the date hereof. Notwithstanding the foregoing, in the event that Gross Compensation during the first twelve (12) months of this Agreement, do not exceed $1,500,000, you shall have the one-time right to terminate this Agreement by written notice to Company, which you shall do, if at all, within 30 days of the end of such twelve month period.

2) You hereby engage Company during the Term, as your exclusive personal manager, representative and advisor, throughout the world, with respect to all of your activities throughout the entertainment industry, and Company hereby accepts such engagement.

3)      (a) Company shall confer with, counsel and advise you in all matters pertaining to your career in the entertainment industry including, without limitation (i) the selection of literary, artistic and musical material; (ii) all matters pertaining to publicity, public relations and advertising; (iii) general practices in the entertainment industry; (iv) the selection of and negotiation with employment, booking and similar agencies that seek employment for artists; and (v) the selection of and negotiation with any and all potential users of your talents or services.
        (b) You shall immediately advise Company of all offers and inquiries so that Company may determine and advise you whether same are compatible with your career.
        (c) You hereby acknowledge that Company is not an employment agent, theatrical agent or licensed artist's manager, and that Company has not promised to procure employment or engagements for you. You shall be solely responsible for payment of all necessary fees to booking or similar agencies.

4)      (a) In consideration of the services rendered by Company to you hereunder, you hereby irrevocably assign to Company, and you shall pay to Company, as and when received by you or applied in your behalf, a sum equivalent to fifteen (15%) percent of your Gross Compensation (the "Fee").
        (b) The Fee shall be paid to Company as and when said Gross Compensation is received by you, without any limitation of time, directly or indirectly, or by any person firm or corporation on your behalf pursuant to (i) any and all contracts, engagements or commitments entered into or negotiated during the term hereof (including, for the avoidance of doubt, the Artist Recording Agreement between you and Cash Money Records/Universal Records, dated January 20, 2005); (ii) any and all extensions, additions, renewals, modifications and amendments of all such contracts, engagements and commitments in (i) and (ii) above; (iii) any and all copyrights and publishing rights in musical compositions written, composed, arranged or adapted in whole or part by you prior to or during the Term of this Agreement; and (iv) any and all judgements, awards, settlements, payments, damages and proceeds relating to any suits, claims, actions, proceedings or arbitration proceedings arising out of alleged breach, non-performance or infringement by others of any of the contracts, engagements, commitments or other agreements or rights referred to in (i), (ii), (iii) and (iv) above, all of which regardless of when entered into, when performed and when effective. Any monies due Company resulting from subparagraph 4(b)(v) above shall be computed after first deducting counsel fees and disbursements.
        (c) You agree that you shall pay all your expenses which may arise in connection with your activities in the entertainment industry including, but not limited to, the cost of material, equipment, facilities, transportation, lodging and living expenses, costumes, legal and accounting fees, and

1"A"

Company shall not have any liability whatsoever in such connection. Company shall not be required to travel to meet with you at any particular place; however, when Company travels on your behalf with your prior consent, it shall be at your sole expense. You agree to reimburse Company for all expenses (sometimes hereinafter "Expenses") which Company advances or incurs on your behalf hereunder, including, but not limited to, the cost of all transportation undertaken by Company at your request or with your consent and all lodging or living expenses connected therewith. Company shall have the right to deduct all Expenses incurred by Company on your behalf whenever Company receives any Gross Compensation. Notwithstanding the foregoing, in no event shall Company have the right to incur any single Expense in excess of $500 without your prior consent, nor shall be Company have the right to incur aggregate Expenses in any month in excess of $2,500 without your prior written consent. In the event Company does incur any such expenses in contradiction of the foregoing, you shall have no obligation to reimburse Company therefore.

(d) All Gross Compensation earned by you shall be paid directly to you or your authorized representative (currently understood to be Madison Smallwood Financial Group LLC ("MSFG"). The Fee due to Company hereunder shall be payable immediately upon receipt of the Gross Compensation upon which the Fee is based. Company may deduct and retain the Fee and all Expenses from any Gross Compensation collected by Company, prior to remitting the balance to you pursuant to subparagraph 7(a) hereof. You hereby irrevocably authorize and direct MSFG (and/or any subsequent authorized representative) to directly pay the Fee due Company to you, in accordance with the terms hereof.

e) Notwithstanding anything to the contrary above, Company's participation in your Gross Income earned, received or credited after the Term in connection with your services and activities rendered or products created after the Term pursuant to contracts or agreements (oral or written) entered into or substantially negotiated during the Term, including any and all renewals, extensions modifications, and additions thereto, shall continue only for a period of four (4) years following the expiration or termination of the Term hereof (the "Post Term Period"), no Fee shall be due thereafter, and shall be as follows:

| Post-Term Years | Fee |
|---|---|
| 1 | 12% |
| 2 | 10% |
| 3 | 8% |
| 4 | 6% |

In connection therewith, you shall provide appropriate authority (including, but not limited to, standard Letters of Direction) to your subsequent manager, accountant, or any third party payor, providing for the payment of the Fee after the expiration of the Term.

5) (a) The parties hereby acknowledge that from time to time during the Term hereof, Company or persons or entities (i) that are owned or controlled by Company, or (ii) that own or control Company or (iii) that are in common ownership and/or control with Company ("Company's Affiliates"), may package an entertainment program in which you are engaged as an artist, or may act as the entrepreneur or promoter of an entertainment program in which you are engaged as artist, or may engage you in connection with the recording and/or production of phonograph records, or as a songwriter, composer, arranger or otherwise in connection with the creation of literary or musical works. Any such activity on the part of Company or Company's Affiliates shall not (A) constitute a breach of this Agreement or of Company's fiduciary obligations and duties to you, or (B) in any way affect Company's right to its Fee hereunder in all instances not covered by the exceptions hereinafter set forth, including, without limitation, the exceptions set forth in paragraph 5(b) below.

(b) Company shall not be entitled to its Fee from you in connection with any monies or other considerations derived by you (i) from any employment or agreement whereunder you are employed by Company (or by Company's Affiliates) or in which Company (or Company's Affiliates) is acting as (A) the packager of the entertainment program in which you are so employed, or (B) your music or literary publisher, or (C) your record company; or (ii) from the sale, license or grant of any literary or musical rights to Company (or to Company's Affiliates).

2

(c) You understand and agree that Company shall not render nor shall Company be obligated to render the personal management services contemplated in this Agreement with respect to the aforesaid non-commissionable activities, and in connection therewith, you shall have the right to seek and retain independent advice.

7)      (a) Within fifteen (15) days after the close of each month during the Term of this Agreement and thereafter so long as Company collects or receives any monies on your behalf, Company shall render a written accounting statement to you setting forth all gross monies received by Company on your behalf hereunder during the preceding month, specifying the source thereof and the deductions therefrom for Company's Fee hereunder and further deducting the amount of any Expenses and any loans or advances paid by Company to you, or on your behalf. Each such accounting statement shall be accompanied by payment to you of the net amount due.

(b) You shall render written accounting statements to Company setting forth the amount of Gross Compensation received directly or indirectly by you, if any, and forthwith pay Company its Fee in connection therewith as well as repay Company any monies owing to Company.

8) You agree that Company and Company's representatives may inspect and audit your books and records to ascertain the amounts due Company, and Company agrees that you or your representatives may inspect and audit those portions of Company's books and records which concern you, all upon reasonable notice.

9) You hereby acknowledge that Company's position hereunder is that of an independent contractor. Company's services are not exclusive to you and Company shall be permitted to perform similar services for other artists during the Term. It shall be within Company's sole discretion to determine the amount of time devoted to you and to others.

10)     (a) You hereby warrant and represent that:

(i) You have the right to make and enter into this Agreement and to grant all of the rights granted to Company and that you are not now under contract to any other personal manager.

(ii) You will, at all times during the Term, devote yourself to your professional career in the entertainment industry and do all things necessary and desirable to promote your career and earnings therefrom.

(iii) You shall not publicly appear or perform for anyone, except through Company as your personal representative hereunder, without Company's prior written consent, which shall not be unreasonably withheld.

(b) You shall at all times defend, indemnify and hold harmless Company and Company's Affiliates from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any alleged breach or breach by you of any warranty, representation or agreement made by you herein. You will reimburse Company and Company's Affiliates, on demand, for any payment made at any time after the date hereof in respect of any liability or claim in respect of which Company or Company's Affiliates are entitled to be indemnified. In the event you fail to so reimburse, Company may deduct such payments from any and all Gross Compensation received by Company hereunder.

(c) Company hereby warrants and represents that it has the right to make and enter into this Agreement and that doing so shall not infringe the rights of third parties.

11) You acknowledge and agree that Company's right to represent you as your sole and exclusive personal manager and your obligation to solely and exclusively use Company is such capacity are unique, irreplaceable and extraordinary rights and obligations and that any breach by you thereof shall be material and shall cause Company immediate and unavoidable damages. Accordingly you agree that, in addition to all other forms of relief and all other remedies which may be available to Company, Company shall be entitled to seek injunctive or other equitable relief against you to enforce Company's rights hereunder.

3

(b) If at any time you fail, for any reason whatsoever, to fulfill or perform any material obligation hereunder, Company shall have the right, exercisable at any time by notice to you, to extend the expiration date of the then current period of the Term, subject to the notice and cure provisions hereof.

12) As used in this Agreement, the following terms shall have the meanings set forth:

(a) "entertainment industry" - includes, without limitation, all services and activities in such fields of endeavor as phonograph records (including but not limited to recording and production), music publishing, transcriptions, musical and/or dramatic performances, singing, radio, television, motion pictures, music, personal appearances, concerts, road shows, tours, cafe and cabaret performing, hotel restaurant and private function performing, literary and theatrical engagements, radio and television commercials, commercial and promotional merchandising arrangements, endorsements and tie-ins and for all and any other media or entertainment for which you may be or become qualified (including, but not limited you, your interest and activities with respect to Young Money Entertainment); and the sale, lease or other disposition of musical, literary, dramatic or other artistic material which you may create, compose, write or collaborate, directly or indirectly, in whole or in part, in any and all fields; and any act, unit or package show of which you may be the owner or part owner, directly or indirectly.

(b) "Gross Compensation" - includes, without limitation, any and all forms of income, payments, consideration, compensation, sums, emoluments or any other thing of value, including salaries, advances, fees, royalties, bonuses, gifts, shares of receipts, stock and stock options, paid to you or applied for your benefit directly or indirectly (i.e., any corporation, partnership, or other entity in which you have an interest), regardless of by whom procured, as a result of your activities in and throughout the Entertainment Industry. Notwithstanding anything to the contrary herein, it is understood and agreed that Company shall not receive a Fee with respect to any sums paid to or on behalf of you which represent payment for recording costs, "sound and light" payments, so-called "tour support" payments, costs incurred in the production of promotional videos, and all third party payments to musicians, arrangers, background singers, samples and other such payments customarily made in the music industry in producing or remixing a record or video.

13) Neither Company nor you may assign this Agreement or any rights hereunder and any such attempted assignment shall be void. This Agreement shall be binding upon you and Company. This Agreement shall also be binding upon any entity which, directly or indirectly, in whole or in part, through one or more intermediaries, owned or controls, is owned or controlled by, or is under common ownership or control with, you (a "Controlled Entity"). Accordingly, this Agreement is hereby accepted by you on your behalf and on behalf of each Controlled Entity.

14) Company shall have the right during the Term hereof to obtain life insurance on your life at Company's sole cost and expense, with Company being the sole beneficiary thereof. Such right shall in no way effect your ability to obtain additional insurance and Company shall cooperate in such regard. You shall fully cooperate in connection with the obtaining of same including completion of any necessary documents, information and physical examinations. Neither you nor your estate shall have any rights to the benefits of such policy.

15) Except as specifically provided herein all notices hereunder shall be in writing and given by registered or certified mail, at the addresses above or such other addresses as the parties my designate from time to time. Such notices shall be deemed given when mailed except that a notice of change of address will be effective from date of receipt. A copy of all notices given to you shall be sent to Marc Stollman Esq., Stollman & Grubman PA, 2000 Glades Road, Suite 410, Boca Raton, Fl 33431.

16) (a) This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and cannot be changed or terminated by you except by an instrument signed by an officer of the Company and you. A waiver by either party of any term or condition of this Agreement shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All remedies, rights, undertakings, obligations, and agreements contained herein shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either party.

4

(b) No breach of this Agreement by either party shall be deemed material, unless the non-breaching party shall have given the other party notice of such breach and such breaching party shall fail to cure such breach within 30 days after receipt of such notice.

(c) Nothing in this Agreement shall be construed to create a partnership or joint venture between Company and you.

(d) This Agreement has been entered into in the State of Florida ("Such State") and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of Such State applicable to contracts entered into and performed entirely within Such State. Only the courts of Such State will have jurisdiction over any controversies regarding this Agreement; and, any action or other proceeding which involves such a controversy will be brought only in Such State. Any process in any action or proceeding commenced in the courts of Such State arising out of any such claim dispute or disagreement, may, among other methods, be served upon you be delivering or mailing the same, via registered or certified mail, addressed to you at the above address or such other address as you may designate pursuant to Paragraph 16 hereof. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within Such State.

(e) If any part of the Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having jurisdiction to make such determination, the remainder of this Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto set their hands on the date and year first above written.

White Tides Entertainment Group Inc.

by: _____
An Authorized Signatory   6/20/05

Dwayne Carter

by: _____
SS# 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

5

## SETTLEMENT AND RELEASE AGREEMENT

**AGREEMENT** dated the _9TH_ day of _August_, 2006, by and between **WHITE TIDES ENTERTAINMENT CORP.** ("WT" or "Company")), with an address at c/o Wolfe & Goldstein, P.A., 100 S.E. Second Street, Suite 3300, Miami, Florida 33131, and **DWAYNE CARTER** ("Carter" or "Artist"), with an address at c/o _Madison Smallwood Financial Group LLC 1111 Lincoln Rd Suite 400 Miami Beach, Fl. 33139_

## WITNESSETH:

WHEREAS, WT claims the Parties executed a Management Agreement between Artist and Company dated the 20th day of June, 2005 (the "**Management Agreement**"), which Carter denies;

WHEREAS, WT filed suit versus Carter for breach of said Agreement, which action is pending in the United States District Court, Southern District of Florida, Case No. 06-20873-CIV-MOORE (the "**Lawsuit**");

WHEREAS, Carter is a party to an agreement with **CASH MONEY RECORDS** ("Cash") dated January 20, 2005, for Carter's recording services, which is distributed by **UNIVERSAL MUSIC** ("Universal") (the "**Cash Contract**");

WHEREAS, the Parties hereto mutually desire that Carter be released from all obligations to WT;

WHEREAS, the Parties desire to amicably resolve the claims pending in the Lawsuit and resolve various other matters concerning their on-going business relationship.

NOW, THEREFORE, in consideration of the mutual covenants and conditions as set forth herein, it is agreed between the Parties as follows:

**1. Adoption of Recitals/Definitions.** The Parties adopt the above recitals as being true and correct. With respect hereto, the following definitions shall apply:

"_B_"

"Record Company" shall mean a company in the business of Recording, manufacturing or distributing recorded music.

"Record Contract" shall mean a contract with a Record Company whether such agreement is structured as an exclusive or non-exclusive contract for services, a license agreement, a distribution agreement, a joint venture, a production agreement or any other agreement of similar import, including but not limited to Carter's contract with Cash dated the 20th day of January, 2005, including any replacement, substitution or extension of a Record Contract.

   **2.  Mutual Release.**  Each of the parties releases the other from any and all claims and causes of action.

   **3.  Payment to WT.**  In consideration for the covenants contained above, Carter agrees to pay WT the following amounts:

   (a) The sum of One Hundred Fifty Thousand ($150,000.00) Dollars, which shall be paid upon execution hereof.

   (b) The sum of One Hundred Fifty Thousand ($150,000.00) Dollars, which shall be paid on or before February 1, 2007.

   (c) The sum of Seventy Five Thousand ($75,000.00) Dollars, which shall be paid on or before November 15, 2007.

   (d) Carter shall sign the Irrevocable Letter of Direction attached hereto as Exhibit 2, directing Universal to pay $75,000.00 directly to Wolfe & Goldstein, P.A. Trust Account, which Universal shall acknowledge that they shall pay to WT the sum of Seventy Five Thousand ($75,000.00) Dollars on or before November 15, 2007, in the event that Carter has not otherwise made such payment prior thereto. If Carter signs a new Record Contract, he agrees to sign a new letter with identical terms to such new Record Company.

(e) All payments made above shall be payable to and sent to Wolfe & Goldstein, P.A. Trust Account.

(f) If Carter shall fail to make a Payment due to WT under Paragraphs (a) through (f) above when due, then the terms of Paragraph 2 shall apply.

**4.  Default.**  Upon the occurrence of a Default (as defined herein), WT shall be entitled to an entry of a Final Judgment against Carter in the amount of such unpaid amounts, together with interest calculated at the rate of One and One-Half Percent (1.5%) per month from the date such Payment was due, plus reasonable attorneys' fees and costs incurred to collect such amount. This Court shall retain jurisdiction to enforce this Agreement.

**5.  Execution of Documents.**  Simultaneously with the execution of this Agreement:

(a) Each of the Parties shall cause their attorneys each to execute a Joint Notice of Dismissal of Action with Prejudice (hereinafter the "Action") in the form annexed hereto as Exhibit 1.

(b) Carter shall have Universal sign the Letter of Direction agreeing to pay to WT the sums provided in Paragraph 3(c) above within Thirty (30) days of execution.

(c) The Parties shall execute such further documents to carry out the intentions expressed herein.

**6.  Release of Claims by WT.**  Except as to those obligations and covenants specifically set forth herein, WT and their affiliates, successors, assigns, hereby forever mutually release, remise and discharge Carter, Madison Smallwood Financial ~~Services, Inc.~~ *Group LLC*, Horace Madison, Young Money Touring Inc., together with their affiliates, subsidiaries, successors, licensees, assigns, agents, attorneys, employees, officers, and directors, from any and all claims, demands, debts, damages, liabilities, actions, causes of action, suits, sums of money, accounts, covenants, promises, contracts,

3

agreements, and controversies which may possess or have had, by reason of any matter which arises out of the Action.

**7.  Release of Claims by Carter.**  Except as to those obligations and covenants specifically set forth herein, the Carter hereby forever mutually releases, remises and discharges WT and Melissa Philipian, together with their affiliates, subsidiaries, successors, licensees, assigns, agents, attorneys, employees, officers, and directors, as well as entity owned, in whole or in part by the other, from any and all claims, demands, debts, damages, liabilities, actions, causes of action, suits, sums of money, accounts, covenants, promises, contracts, agreements, and controversies which Carter has, or may has had by reason of any matter which arises out of the Action.

**8.  Effect of Release.**  The release described in Paragraphs 6 and 7 shall be binding upon, and shall inure to the benefit of all of the Parties' hereto, including their heirs, successors, and assigns.

**9.  Representations And Warranties.**

(a) Carter hereby represents and warrants that:

(i)  Carter possesses the full right, power and authority to enter into this Agreement.

(b) This Agreement shall not adversely affect any third-party's rights.

(c) A breach of any of the foregoing warranties shall not form the basis of a rescission action or fraud in the inducement claim and shall only support a claim for damages at law.

**10. Further Assurances.**  The Parties hereto agree to execute all further documents necessary to effectuate the terms of this Agreement.

**11. Indemnification.**  The Parties agree to defend, indemnify and hold one another harmless against any and all liability, loss, damages, cost or expense, including court costs and reasonable

attorneys' fees, paid or incurred and arising out of or connected with any third-party claims which is inconsistent with any of the warranties or representations made hereunder. The party seeking indemnification shall give the indemnifying party prompt notice of any claim to which the foregoing indemnification relates.

12. **Waiver of Rescission Claim.** Each of the Parties hereto hereby waives any and all rights, if any, whether existing presently or in the past or in the future, and whether or not known, to modify, alter, or rescind this Agreement or any of the terms of this Agreement in any manner, or to seek to do so, on any ground whatsoever, whether presently known or not known.

13. **Legal Counsel.** Each of the Parties hereto is entering into this Agreement based on his or its own assessment that it is advantageous for him or it to do so and based upon the advice of experienced counsel independently selected and thoroughly familiar with the Parties' heretofore-existing rights and obligations as against each other.

14. **Modification/Applicable Law.** This Agreement sets forth the entire understanding and agreement between the Parties with reference to the subject matter hereof, may not be modified or terminated orally, and shall be construed, interpreted and the rights of the Parties determined, in accordance with the Laws of the State of Florida applicable to agreements made in the State of Florida and to be wholly performed in the State of Florida.

15. **Only Express Representations or Warranties Govern.** No representations or warranties of any type, nature or description, other than those specifically set forth in this Agreement, have been made by either party to the other in connection with this Agreement, and no party to this Agreement is relying upon any representation or warranty of any other party, other than as specifically set forth in this Agreement.

**16. No Admissions.** This Agreement is not an admission by or statement against the interests of the Parties hereto with respect to the claims and issues of dispute with the Action.

**17. Exhibits.** The exhibits to this Agreement are an integral part hereof and are hereby incorporated by reference.

**18. Confidentiality.** The parties acknowledge that they have signed a confidentiality Agreement in the form of a Stipulated Motion for a Protective Order and agree that the terms of same shall remain in place. The parties agree that all documents produced in this case, or documents held by WT pursuant to the terms of the Management are confidential, trade secrets and terms, which shall not be disclosed to any third-party absent service of a subpoena. If WT is served with a subpoena, it shall advise Carter of same and give Carter the opportunity to seek a protective order. Except as shall be necessary to enforce this settlement, the terms shall not be dissolved to any third-party, except to such parties, attorneys, accountants and business managers.

**19. Non-Disparagement.** The parties agree that they shall not slander, defame or disparage one another. If asked to comment on the other party, the parties shall state in substance "all issues pertaining to my business relationship with (the other) have been amicably resolved." The parties may issue a joint press release to the effect of same.

**20. Platinum Records.** Carter shall provide to WT written permission to obtain RIAA Certifications/Gold/Platinum Records on any albums released under the Record Contract.

**21. Counterparts.** This Agreement may be signed and exchanged among the Parties via fax and in counterparts, and shall be a valid and binding agreement when signed and exchanged in such form. The Parties also intend to circulate additional copies of this Agreement for signing, with ink signatures and not in counterparts, but a failure to implement this intention shall not in any respect

affect or limit the validity and binding nature of this Agreement when signed and exchanged as set forth in the first sentence of this paragraph.

22. **Notices.**  All notices as may be required by this agreement are to be transmitted by telefax or by hand delivery to the following addresses:

| | |
|---|---|
| If to WT: | c/o Melissa Philipian<br>925 Ladson Court<br>Decauter, Georgia  30030 |
| With a copy to: | Richard C. Wolfe, Esq.<br>Wolfe & Goldstein, P.A.<br>100 S.E. Second Street<br>Suite 3300<br>Miami, Florida  33131 |
| If to Carter: | c/o Madison Smallwood Financial Group, LLC<br>1111 Lincoln Road - Suite 400<br>Miami Beach, FL 33139 |
| With a copy to: | Joseph E. Porter, III, Esq.<br>206 3rd Street<br>Seal Beach, California  90740 |

All notices shall be deemed effective when mailed.

23. **Headings.**  The headings of each part of this agreement are for reference only and will not be deemed to modify or alter the terms as set forth in the body of the agreement.

**IN WITNESS WHEREOF**, the Parties hereto have caused this agreement to be executed as of the date and year first set forth herein.

Witnesses as to all Signatures:                    **WHITE TIDES ENTERTAINMENT CORP.**

Print Name:_____        By:_____
                                                    Melissa Philipian, Its President

                                                    _____
                                                    Melissa Philipian, Individually

Print Name: Joseph E. Porter III          **DWAYNE CARTER**

8

## EXHIBIT 1

### JOINT DISMISSAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 06-20873-CIV-MOORE

WHITE TIDES ENTERTAINMENT
GROUP, INC.,

      Plaintiff,

v.

DWAYNE CARTER, AKA LIL' WAYNE,
YOUNG MONEY TOURING,
INC., and MADISON SMALLWOOD
FINANCIAL GROUP, LLC,

      Defendants.

_____/

### JOINT NOTICE OF DISMISSAL OF ALL CLAIMS AND
### COUNTERCLAIMS WITH PREJUDICE RESERVING JURISDICTION

      The undersigned Parties, being all the Parties interested in the outcome of the matter, hereby give notice of their dismissal (with prejudice) of all claims filed in the case, including all related, ancillary or appurtant thereto as described in the Settlement Agreement between the Parties of even date (the "Settlement Agreement"). Each party shall bear the burden of their own attorneys fees and costs. Notwithstanding same, the Parties reserve unto this Court the right to any orders as may be needed to confirm and/or enforce the terms of the Settlement Agreement.

DATED: *August 9* , 2006

DWAYNE CARTER, Defendant

_____
Joseph H. Porter, III, Esq.
Counsel for Defendant s
All

WHITE TIDES ENTERTAINMENT
CORP., Plaintiff

By:_____
Richard C. Wolfe, Esq.
Counsel for Plaintiff

9

## EXHIBIT 2

### Letter of Direction

**DWAYNE CARTER**
**c/o Ron Sweeny, Esq.**
**440 Ninth Avenue**
**17th Floor**
**New York, NY 10001**

TO:    Universal Records


Dear Sirs:

I have entered into a Settlement Agreement with White Tides Entertainment Corp. Pursuant to that Agreement, a copy of which is attached for your files, I have agreed to:

1.    Pay to them the sum of $75,000.00 on or before November 15, 2007.

2.    I hereby request that as an accommodation to me, that you will undertake these efforts to pay White Tides Entertainment Corp. said amounts in the event that I have not done so.

3.    Said payment shall be made to White Tides Entertainment Corp., whose address is c/o Wolfe & Goldstein, P.A., 100 Southeast Second Street, Suite 3300, Miami, FL 33131.

4.    Direct payment to White Tides Entertainment Corp. of any and all monies otherwise due to me so that I may fulfill my obligations to White Tides Entertainment Corp. under the above-referenced settlement agreement.

5.     This Letter of Direction shall be irrevocable.

Very truly yours,

Dwayne Carter

## ACKNOWLEDGMENT

The undersigned agrees that we shall pay White Tides Entertainment Corp. the amount set forth above:

Universal Music

By:_____

H:\White Tides Entertainment Corp\v. Dwayne Carter\Docs\settlement and release agreement.doc

11